UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TOBY K. PAYNE, | ) |
|     Petitioner, | ) ) ) |
| v. | ) ) Case No. 1:14-cv-00033-TWP-TAB |
| SUPERINTENDENT, Indiana Department of Corrections c/o Attorney General of Indiana Gregory Zoeller, | ) ) ) ) ) |
|     Respondent. | ) ) |

**ENTRY REGARDING PETITION FOR WRIT OF HABEAS
CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**

This matter is before the Court on Petitioner Toby K. Payne's ("Mr. Payne") Petition for Writ of Habeas Corpus ([Filing No. 1](#)). For the reasons explained in this Entry, the Petition must be denied and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

### I.    BACKGROUND

The pleadings and the expanded record establish the following:

1. On April 13, 2009, Mr. Payne entered a plea of guilty to two counts of murder and one count of criminal confinement. He was sentenced on May 15, 2009 to two terms of life without the possibility of parole, plus fifty years. No direct appeal was filed.

2. On February 26, 2013, Mr. Payne filed a motion to correct errors in the trial court. The court denied that motion on March 21, 2013. No appeal was filed.

3. Mr. Payne's co-defendants were each found guilty following jury trials. The direct appeal of co-defendant Juan Lucio produced a description of the setting for the crimes to which Mr. Payne entered a plea of guilty:

The trial evidence favorable to the verdict indicated that the defendant was recruited by Toby Payne to kill Payne's estranged wife Rebecca Payne, and her boyfriend, George Benner. Toby had given the defendant a key to Rebecca's house and a map, and promised him $100,000 from a life insurance policy in return for the killing. The defendant, in turn, recruited Kyle Duckworth to drive him to Rebecca's house in exchange for $200 or a quarter-pound of marijuana. Originally, the defendant planned to be the shooter, but later changed his mind and recruited Anthony Delarosa to be the triggerman. On April 2, 2007, Duckworth drove the defendant and Delarosa to Rebecca's house. The defendant gave Delarosa a gun, and Delarosa entered the house but returned and said that Rebecca was not home. The men agreed to try again later. On April 4, the defendant called Duckworth to pick him up, called Delarosa to ask if he was ready, and called Toby Payne to inform him they were trying again. The three men drove to Rebecca's home, the defendant again gave Delarosa a gun, and Delarosa entered the house and fired the fatal shots. When police had questioned him during their investigation, the defendant first admitted that Toby Payne had given him a key to the house and asked him to kill Rebecca, but later claimed that they were supposed to scare Rebecca and extort money from her, that Delarosa told him where to go, that he did not know Delarosa had a gun, that he did not know why Delarosa was extorting money from her, and that he and Duckworth were supposed to get $200 each for driving.

*Lucio v. State*, 907 N.E.2d 1008, 1009 (Ind. 2009). The subsequent direct appeal of co-defendant Anthony Delarosa produced the following description:

The bodies of Rebecca Payne and her boyfriend, George Benner, were discovered in her bedroom at her house in Home Place, Indiana, around noon of April 5, 2007. Police investigation quickly focused on Toby Payne, Rebecca's estranged husband against whom she had obtained a protective order a month earlier. Rebecca, who was in the final stages of divorcing Payne, had been living apart from him with their six-year-old son.

Phone records led the police to arrest Juan Lucio, Kyle Duckworth, and Anthony Delarosa within two weeks of the murders. Lucio and Duckworth lived in Frankfort, and Delarosa lived in Zionsville. A search of Delarosa's bedroom uncovered dark-colored clothing, dark gloves, a letter purportedly from Payne, a rag that smelled of a solvent often used to clean guns, and two keys. A search of Lucio's person and vehicle uncovered two keys. All four keys locked and unlocked Rebecca's front door. Delarosa was charged with two counts of murder and one count of conspiracy to commit murder, all Class A felonies. The State requested life sentences without parole for the two murder charges.

Duckworth testified at Delarosa's trial pursuant to a plea agreement. Tara Cassada, Lucio's girlfriend, and Erica Tamayo, Duckworth's girlfriend, also testified. Lucio, Duckworth, Cassada, and Tamayo socialized together frequently,

and the two boyfriends often confided in their girlfriends. Cassada was granted "use immunity" to testify.

Cassada testified that sometime in the fall of 2006, Payne began making plans with Lucio to kill Rebecca to get full custody of their son, and he gave Lucio a key and a map to Rebecca's house. Lucio originally planned to do the shooting himself, but hired Delarosa because "he would go in and be out quick." Lucio and Delarosa would then split Rebecca's $100,000 life insurance policy.

Duckworth testified that in late March or early April of 2007, Lucio asked him to help with the shooting. They were not to harm Payne's son, but would kill George if he was there. Duckworth would be the driver, and he would receive $200 or a quarter pound of weed for his involvement.

On the evening of April 2, 2007, Duckworth picked up Lucio and Delarosa, and the trio drove to a parking lot behind Rebecca's house. Lucio gave a gun to Delarosa and instructed him where to go. Delarosa left the car, returned about 20 minutes later, said nobody was home, and gave the gun back to Lucio.

Two days later, on April 4, the trio tried again. Duckworth picked up Lucio from his home in Frankfort and Delarosa from his home in Zionsville. Duckworth drove to the same parking lot, and Lucio again gave the gun to Delarosa, who left the car around 9:00PM. Duckworth moved his car to a different spot, prompting a cell phone call from Delarosa about 20 minutes later asking where they were. When Delarosa returned to the car, he said, "they're done," and recounted how he walked in on George performing oral sex on Rebecca in her bedroom. Delarosa said he emptied his clip, shot them both, and left her body on the bed and his body on the floor. Cassada and Tamayo both testified as to what their respective boyfriends said Delarosa said that evening. On the way home, at 9:41PM, Duckworth was pulled over because his license plate light was out. The officer knew and recognized Delarosa, who was sitting in the back seat of the car, and testified that Delarosa was wearing dark-colored clothing.

Forensics experts confirmed that Rebecca died from a gunshot wound to the head and that George died from a gunshot wound to the chest. . . .

Phone records confirmed a large amount of communication between Payne, Lucio, Duckworth, and Delarosa leading up to and following the murder, and allowed the officers to track the movements of the cell phones. The three days before the protective order was served on Payne, February 26–28, 2007, Lucio placed one call to Payne and two calls to Delarosa. On March 1, Lucio placed four phone calls to Payne and one to Delarosa. The following day, Lucio placed three calls to Payne and six to Delarosa. Records from April 2, the day of the first attempt, showed eleven calls between the four. On April 4, Lucio's cell phone "hit on"—i.e., utilized—a tower in Frankfort from 11:39AM to 8:12PM. From 8:27PM to 8:29PM, Lucio's cell phone hit on a tower in Thorntown. At 9:27PM, both Lucio

3

and Delarosa's cell phones hit on a tower in Home Place located about half-a-mile from Rebecca's home. This hit corresponded with a call Delarosa placed to Lucio at 9:27PM. Lucio's cell phone then hit on towers in Brownsburg, from 9:50PM to 9:53PM, and in Frankfort, at 10:14PM. Phone records for April 5, the day the bodies were discovered, showed twenty calls between the four. On April 11, during the officers' interviews of Cassada and her mother, Lucio and Delarosa exchanged six text messages and one phone call.

      A cellmate who was with Payne and Delarosa at the Hamilton County Jail testified that when Delarosa arrived at the cell block, Payne was already there. Delarosa said to Payne, "You got me hit on my cell phone." A few days later, the cellmate overheard Delarosa asking Payne, "Where is the money?"

      The jury found Delarosa guilty on all three counts. . . . The trial court imposed a sentence of fifty years for the conspiracy count, and ordered that to be served consecutively to the LWOP sentences.

*Delarosa v. State*, 938 N.E.2d 690, 692-94 (Ind. 2010) (footnotes omitted).

    4.      Mr. Payne filed the instant Petition on January 10, 2014.

## II. DISCUSSION

The Respondent argues that the merits of Mr. Payne's habeas claims should not be reached because Mr. Payne failed to file the action within the time permitted by the applicable statute of limitations and because Mr. Payne committed procedural default by not presenting his habeas claims to the Indiana state courts before filing his federal habeas petition.

In response, Mr. Payne contends that the circumstances of his confinement prior to the entry of his guilty plea were so heinous that they compelled his confession at the guilty plea hearing and that on this basis the Court can and should reach the merits of his habeas claims. The Court will discuss the parties' contentions in turn.

**A.**     **Statute of Limitations.**

"We live in a world of deadlines." *Spears v. City of Indianapolis,* 74 F.3d 153, 157 (7th Cir. 1996). In an attempt to "curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law," Congress, as part of the Anti-terrorism and

4

Effective Death Penalty Act of 1996 ("AEDPA"), revised several of the statutes governing federal habeas relief. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). The AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). The AEDPA's limitations period is subject to statutory and equitable tolling. *See Wood v. Milyard*, 132 S. Ct. 1826, 1831 (2012) (statutory tolling); *Holland v. Florida*, 560 U.S. 631 (2010) (equitable tolling).

Mr. Payne does not allege, and the Court cannot discern, any facts triggering the application of § 2244(d)(1)(B), (C), or (D). As such, the one-year period of limitations began to run when Mr. Payne's conviction became final under § 2244(d)(1)(A). A conviction is "final" when the time for seeking direct review from the judgment affirming the conviction has expired. *Griffith v. Kentucky*, 479 U.S. 314, 321 & n.6 (1987). Mr. Payne's conviction became final on June 14, 2009; the last day on which Mr. Payne could have filed a notice of appeal from his conviction.

The statute of limitations pertaining to Mr. Payne's conviction therefore commenced on June 15, 2009 and, absent statutory or equitable tolling, expired one year later on June 15, 2010. Because Mr. Payne never filed a petition for post-conviction relief in the state courts, and in

5

particular because Mr. Payne did not file such an action before June 15, 2010, the statutory tolling provision codified at 28 U.S.C. § 2244(d)(1)(A) is inapplicable here. *See id.* § 2244(d)(2) (providing that "time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward" the limitations period of § 2244(d)(1)); *Fernandez v. Sternes,* 227 F.3d 977, 978-79 (7th Cir. 2000). There is no basis in the record to conclude that any other triggering event applies here. *See Taliani v. Chrans*, 189 F. 3d 597 (7th Cir. 1999) (discussing 28 U.S.C. § 2244(d)(1)(D)). Mr. Payne contends that his conviction became final when the trial court denied his motion to correct errors on March 21, 2013 is unsupportable. Case law is clear that the limitations period is not tolled or restarted by post-conviction proceedings filed after the one-year period of limitation has expired. *De Jesus v. Acevedo*, 567 F.3d 941, 944 (7th Cir. 2009) ("A state court's order denying a request for collateral review (whether on the merits or for any procedural reason) does not require the exclusion, under § 2244(d)(2), of time that passed before the state collateral proceeding began.").

Having determined that statutory tolling is not available to Mr. Payne, the Court must consider whether he is entitled to equitable tolling of the statute of limitations. A petitioner seeking equitable tolling must establish "that he has been pursuing his rights diligently" and "that some extraordinary circumstance stood in his way" which prevented him from timely filing his § 2254 petition. *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (citing *Pace v. DiGuglielmo,* 544 U.S. 408, 418 (2005)). "The burden of establishing entitlement to this extraordinary remedy plainly rests with the petitioner." *Drew v. Dep't of Corr.,* 297 F.3d 1278, 1286 (11th Cir. 2002).

Mr. Payne neither faced extraordinary circumstances standing in the way of his habeas filing nor exercised due diligence in filing the petition.

A federal court may entertain an untimely claim if a petitioner makes a showing of actual innocence. *McQuiggin v. Perkins,* 133 S. Ct. 1924 (2013). An equitable exception does not extend a statute of limitations, but will instead "override the statute of limitations when actual innocence is shown." *Id.* at 1931 (citing *Rivas v. Fischer,* 687 F.3d 514, 547 n.42 (2d Cir. 2012))*; see also Aruajo v. Chandler*, 435 F.3d 678, 682 (7th Cir. 2005). "'This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons.'" *McQuiggin,* 133 S. Ct. at 1931 (quoting *Herrera v. Collins,* 506 U.S. 390, 404 (1993)). To establish that a "miscarriage of justice" has occurred, the petitioner must show that a constitutional error occurred and, absent this error, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.* at 1933 (quoting *Schlup v. Delo,* 513 U.S. 298, 329 (1995)). The Supreme Court has emphasized that such a claim must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup,* 513 U.S. at 324.

While Mr. Payne suggests that he could make an argument of actual innocence, he has failed to provide any new, reliable evidence that would support such a claim. Additionally, Mr. Payne's suggestion of his actual innocence only suggests that his will was overborn at his guilty plea. This highly implausible "actual innocence" scenario only implicates his *legal,* as opposed to his *factual,* innocence. *Jones v. Hanks,* 1997 WL 355515, at *2 (7th Cir. June 24, 1997) (unpublished opinion) (finding that petitioner's assertion that he was innocent because his conviction was based on erroneous jury instructions merely raised a claim of legal innocence); *Williams v. Delo,* 82 F.3d 781, 784 (8th Cir. 1996) (holding that petitioner's challenge to jury

7

instructions, in light of some new cases, did not demonstrate his actual innocence because petitioner "only asserts legal innocence, not actual innocence"); *Canaan v. Davis,* 2003 WL 118003, at *30 (S.D.Ind. Jan.10, 2003), *rev'd in part on other grounds, Canaan v. McBride,* 395 F.3d 376 (7th Cir. 2005) (holding that petitioner's challenge to jury instructions did not demonstrate his actual innocence because it rested upon asserted "legal error." Therefore, this evidence cannot form the basis of an equitable exception to the AEDPA's statute of limitations. *Schlup,* 513 U.S. at 324, 327. Consequently, no exception or exclusion to the statute of limitations exists, and Mr. Payne's petition is barred by the statute of limitations.

**B.     Procedural Default.**

The Respondent also argues that Mr. Payne's habeas petition is barred by the doctrine of procedural default. Mr. Payne never presented his habeas claims to the Indiana Supreme Court. His failure to do so constitutes procedural default. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999) (holding that "a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort" has not properly exhausted the claims for purposes of 28 U.S.C. § 2254(b)(1), and that the habeas petitioner's failure to present his "claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims."); *Hough v. Anderson,* 272 F.3d 878, 892-93 (7th Cir. 2001) (petitioner's failure to present issue to Indiana Supreme Court constituted procedural default).

Mr. Payne has committed procedural default as to his habeas claims. He has not shown, and has not attempted to show, cause for and prejudice from that default. *Conner v. McBride,* 375 F.3d 643, 648 (7th Cir. 2004) (internal citations omitted); *see also Dellinger v. Bowen,* 301 F.3d 758, 764 (7th Cir. 2002), *cert. denied,* 537 U.S. 1214 (2003).

Under Indiana law,

> [a] person who has been convicted of, or sentenced for, a crime by a court of this state, and who claims . . . (5) that his sentence has expired, his probation, parole or conditional release unlawfully revoked, or he is otherwise unlawfully held in custody or other restraint . . . may institute at any time a proceeding under this Rule to secure relief.

Ind. Post-Conviction Rule 1(1)(a)(5). This procedure provides a meaningful remedy in the Indiana courts. *Wallace v. Duckworth,* 778 F.2d 1215, 1219 (7th Cir. 1985).

Although under Indiana law the guilty plea pretermitted a direct appeal for most claims, Mr. Payne could have challenged his conviction through the filing of a petition for post-conviction relief. He did not do so. His failure to do so, combined with the guilty plea, leaves him without a factual record to support his claims. He cannot support his claims with mere argument, although he makes that effort. The absence of a record is a very significant factor here because federal habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster,* 131 S. Ct. 1388, 1398 (2011). Because of this, Mr. Payne's effort to expand the record at this point is rejected. The same ruling is made as to Mr. Payne's effort for the Court to authorize unspecified discovery. *See Bracy v. Bramley,* 520 U.S. 899, 904 (1997) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course").

Nevertheless, a petitioner may overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell,* 547 U.S. 518, 536 (2006); *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). Under this narrow exception, a habeas applicant must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo,* 513 U.S. 298, 324 (1995). "The fundamental miscarriage of justice standard erects an extremely high bar for the habeas petitioner to clear. It applies only in the rare case where the petitioner can prove

that he is actually innocent of the crime of which he has been convicted." *McDowell v. Lemke*, 737 F.3d 476, 483 (7th Cir. 2013) (citing cases).

Mr. Payne has not cleared the "extremely high bar" set by the fundamental miscarriage of justice standard. *Id.* Just as discussed relative to the "actual innocence" exception to the statute of limitations barrier, Mr. Payne has not identified "new reliable evidence" that was not presented at trial and in light of which "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell,* 547 U.S. 518, 537 (2006) (citing *Schlup v. Delo,* 513 U.S. 298, 299, 324–29 (1995)). Accordingly, Mr. Payne's claim is barred by the doctrine of procedural default.

### III. CONCLUSION

"[H]abeas corpus has its own peculiar set of hurdles a petitioner must clear before his claim is properly presented to the district court." *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 14 (1992) (O'Connor, J., dissenting) (internal citations omitted). Mr. Payne has sought federal habeas corpus relief from a state conviction by essentially ignoring the state courts. In doing so, Mr. Payne has encountered the hurdles produced by the one-year statute of limitations and the doctrine of procedural default. He has not shown the existence of circumstances permitting him to overcome these hurdles, and hence is not entitled to the relief he seeks. For the reasons set forth above, Mr. Payne's Petition for Writ of Habeas Corpus is **DENIED** and this action is dismissed with prejudice without a decision being made as to the merits of his claims. *See Bachman v. Bagley,* 487 F.3d 979, 982 (6th Cir. 2007).

Judgment consistent with this Entry shall now issue.

### CERTIFICATE OF APPEALABILITY

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing

§ 2254 Proceedings, and 28 U.S.C. § 2253(c), the Court finds that Mr. Payne has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this court] was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, the Court **DENIES** a certificate of appealability.

**SO ORDERED.**

Date: 3/6/2015

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Loren Jay Comstock
lorenjcomstock1@yahoo.com

Henry A. Flores, Jr.
OFFICE OF THE INDIANA ATTORNEY GENERAL
henry.flores@atg.in.gov